IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ALMONDNET, INC.,                                              OPINION and ORDER

                Plaintiff,                              10-cv-298-bbc

     v.

MICROSOFT CORPORATION,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In this patent infringement suit, plaintiff AlmondNet, Inc. is suing defendant Microsoft Corp. for alleged infringement of 28 claims of its United States Patents Nos. 6,973,436 ('436 patent); 7,072,853 ('853 patent); 7,454364 ('364 patent); and 7,822,637 ('637 patent).  Defendant has filed counterclaims against plaintiff, asserting its own claims of infringement of its United States Patent No. 6,632,248.  The parties' request for claims construction is now before the court.

The parties propose specific definitions for each of the claim terms at issue, and to some degree focus on the specific words they believe will best define the term.  For example, defendant has proposed that the phrase "selecting the combination . . . that yields the

highest price" be construed as, in part, "determining which of the combinations . . . adds up to the highest price . . ." Similarly, plaintiff seeks to change "user" to "individual" and "information" to "preferences for customizing a webpage." For these changes and others like them, the parties do not identify any related dispute about the scope of the claim terms but instead seem focused on clarifying the language for the jury.

At this stage of the proceedings, the only disputes that must be resolved are ones relating to the presence of specific limitations in the claims, not the ability of a juror to understand the language. I have learned that attempting to sort out the exact words to use to define a term often leads to trouble. As I explained in another case:

> In my experience, attempting to resolve the parties' disputes by providing specific definitions to a given claim term is nothing but an invitation to a new round of arguments at a later stage about the meaning of the court's construction, or about the hidden implications of the language adopted. It is counterproductive to resolve claims construction disputes by replacing them with new ones for the parties to dispute about at summary judgment.

Sandisk Corp. v. Zotek Electronic Co., Ltd., 2010 WL 3743540, *2 (W.D. Wis. Sept. 22, 2010). Moreover, a word-by-word definition for a term is rarely if ever necessary to resolve the concrete dispute between the parties that serves as the basis for construing the claim to begin with. There may be times when providing specific definitions is useful, especially if it could help the jury better understand the terms. However, it would be premature to address such concerns at this stage. Therefore, despite the parties' best attempts to define

2

the terms, I will decline to sort out their disagreements about which specific phrases to use to describe the terms.

This takes several claim terms off the table entirely.  The parties' disputes about the terms "each of which plurality of bids," "visitor," "customization information," "user" and "HTML document" focus on specific language rather than the presence of concrete limitations, so it is unnecessary to provide any construction for those terms.  If concerns arise before trial about jury confusion, the parties can request specific language in limine.

This leaves six disputes between the parties about the presence of specific limitations in the patents.  With respect to plaintiff's patents, the parties dispute (1) whether the pricing used in the patent must be tied to the display of an advertisement; (2) whether the bid selected as the "highest price" must be the price an advertiser has agreed to be charged; (3) whether the claimed "spreading" of attributes requires forming "every possible combination of attributes" from a bid's required attributes and one or more non-required attributes; (4) whether the claimed "economic value contribution" includes more than merely the "price"; and (5) whether the term  "at least some of the plurality of attributes" must include more than one "plurality of attributes."  With respect to defendant's patents, the parties dispute whether "obtaining" records requires "receiving" an "affirmative submission" from the user.

I conclude that of the proposed limitations mentioned above, only two are supported. First, the claimed "spreading" of attributes need not form "every possible combination of

attributes" or include both required and non-required attributes in each combination, but "spreading" must form more than one combination of attributes.  Second, the term "at least some of the plurality of attributes" requires more than one plurality of attributes.  None of the other limitations requested are warranted.

## I.  PLAINTIFF'S PATENTS

Plaintiff's patents relate to methods for facilitating internet advertisement, connecting advertisers with target groups by obtaining information about a website visitor and his or her interests and matching that up with advertisers' bids on what they would pay for each particular interest or feature of the visitor.  All of its patents share the same specification.[1]

### A. Claim Terms Related to Basis for Pricing

The parties dispute whether pricing in the invention is limited to pricing related to the display of an advertisement (pay-to-display) or could relate to other things, such as paying for clicks on the ad.  (Defense counsel stated at the claims construction hearing that the parties were in agreement because plaintiff was willing to accept a construction that involved describing "delivery" in terms of what the advertiser offered to pay in connection

---

[1]  Following the parties' lead, I cite the '436 patent specification for all plaintiff's patents.

with the *display* of an advertisement.  However, accepting such a construction would just shift the parties' dispute to what is meant by "in connection" with the display of an advertisement.)  According to defendant, the following terms require pay-to-display pricing: "transacting," found in claim 1 of the '436 and claim 1 of the '853 patent; and "delivery of," found in claims 1, 11 and 15 of the '364 patent and claim 1 of the '637 patent.

However, nothing in the claim language expressly requires pay-to-display pricing. Claim 1 of the '436 patent and claim 1 of the '364 patent are representative of the claims at issue in this case.  Claim 1 in the '436 patent states:

> 1. A method for **transacting** an advertisement transfer from an advertisement distributor to a visitor, the method comprising performing the steps of:
> (a) prior to the occurrence of a visitor visitation at a communications node,
>> (i) making at least one advertisement distributor aware that profile information comprising visitor attributes and corresponding economic value contributions is desired,
>> (ii) collecting responses from the at least one distributor, wherein a preponderance of the responses have a plurality of attributes and the at least one distributor has assigned to each of at least some of the plurality of attributes an economic value contribution,
>> (iii) spreading the attributes of a preponderance of the responses to form a number of combinations of various attributes,
>> (iv) determining the price of each combination of attributes by logically and arithmetically aggregating the economic value contributions,
> (b) upon the occurrence of a visitor visitation at a communications node, the communication node electronically:
>> (i) constructing a profile of the visitor containing various attributes,
>> (ii) selecting the combination from the response that includes some or all of the attributes from the profile and that yields the highest price,
>> (iii) contracting, between the node and the distributor of the selected combination, a transference of an advertisement from the distributor to the

5

> visitor, and
> (iv) effecting a transfer of the advertisement to the visitor.

Claim 1 in the '364 patent states:

> 1. A method for automatically regulating opportunities for presenting electronic advertisements while a visitor is in contact with a communications node, the method comprising:
> Upon a visitor visiting a communications node, electronically and automatically, and individually for that visitor:
> (a) obtaining a profile of the visitor, which profile contains data identifying various attributes believed to be associated with the visitor;
> (b) accessing pre-stored data derived from a plurality of pre-collected bids, the bids being for **delivery** of an associated advertisement to a visitor visiting the communications node, each of which plurality of bids having been collected by receiving:
> > (i) a first offer price if a visitor to the communications node has a subset of attributes; and
> > (ii) at least one supplemental offer price if the visitor has an individual attribute in addition to the subset of attributes;
> (c) identifying from the data which of the bids yields the greatest overall price for delivery of the associated electronic advertisement to the visitor visiting the communications node, the overall price for each bid being based on the total of (i) the first offer price associated with a subset of attributes that match the corresponding entries in the visitor's profile, and (ii) the at least one supplemental offer price, in each case where the individual attribute matches the corresponding entry in the visitor's profile;
> > (d) arranging for the delivery of the electronic advertisement associated with the identified bid to the visitor; and
> > (e) recording billing data identifying the delivered advertisement and the price for delivery of the advertisement to the visitor pursuant to the identified bid.

Notably, none of the language in the asserted claims refers to "display" of an advertisement or sets defined limits on the type of pricing to use.

Also, the specifications for the asserted patents describe a broader array of allowable pricing, stating that "[i]n the context of the present invention, the payment could be for

showing an ad to the visitor with the profile looked after by the distributor; or for that visitor clicking the distributor's ad and visiting the distributor's site" or "giving information about himself to the distributor." '436 pat., col. 4, lns. 22-26.

Despite the open-ended nature of the claims and the broad description provided in the specifications, defendant contends that the claims require that pricing be for the "showing, display or presentation" of an advertisement because aside from the one "isolated" reference to payment for clicks mentioned above, the specification refers repeatedly to "showing" or "transferring" the advertisement "when discussing delivery of an ad to a visitor." Dft.'s Resp. Br., dkt. #44, at 3, (citing '436 pat., col. 2, ln. 17; col. 3, ln. 41; col. 4, ln. 46; col. 8, lns. 11-13, 31 and 56; col. 19, ln. 21; col. 20, ln. 41; col. 21, ln. 4.)

There are several problems with this argument. First, all but one of the references cited are to "transfer," not "show." Defendant does not explain why the "transfer" of an advertisement requires its "display." Why, for example, couldn't the advertisement be "transferred" to a computer and stored without immediate display? More important, however, is the fact that the "transfer" described repeatedly as part of the "present invention" is already a part of the claims. For example, claim 1 of the '436 patent requires "effecting a transfer of the advertisement to the visitor," language the specification simply repeats in the instances defendant has cited. As for the single reference to "show," it is in the context of a preferred embodiment: the specification describes the last step in a particular search as

7

"[s]elect[ing] the highest bidder to show its advertisement to the visitor." '436 pat., col. 19, lns. 19-21.  The very next sentence refers to "the above detailed description of a preferred embodiment."  Id., col. 19, lns. 22-23.

As the Court of Appeals for the Federal Circuit has explained, a claim should not be limited simply because a specific embodiment shows the requested limitation.  Phillips v. AWH Corp., 415 F.3d 1303, 1323 (Fed. Cir. 2005).  An embodiment may serve to limit a claim only if it is clear that the patentee intended to limit the scope of the claims to the disclosed embodiment.  Id.; see also On Demand Machine Corp. v. Ingram Industries, Inc., 442 F.3d 1331, 1339-40 (Fed. Cir. 2006) (claim limitation warranted because specification used the term "customer" repeatedly in specialized context); Nystrom v. TREX Co., 424 F.3d 1136, 1144-45 (Fed. Cir. 2005) (claim limitation warranted because written description and prosecution history used term "board" consistently to refer to wood decking materials cut from log).  One of the ways such an intent may be found is from the presence of "repeated and definitive remarks" in a specification that a particular limitation applies to the claims. Computer Docking Station Corp. v. Dell, Inc., 519 F.3d 1366, 1374 (Fed. Cir. 2008). Nothing about the specification's references to "show" and "transfer" in this case suggests an intent to narrow the claims to pay-to-display pricing only.

Next, defendant contends that the requirement for pay-to-display pricing can be gleaned from dependent claim 15 of the '436 and '853 patents.  The claim adds the requirement that

there be "a follow-up visit by the visitor to an address associated with the transacted advertisement." '436 pat., cl. 15.  According to defendant, this means the steps described in claim 1 must have already occurred before any visit to the website, excluding any sort of "pay-to-click" pricing.

Plaintiff contends that the language of claim 15 does not dictate when the "follow-up" step must occur or when any particular 'payment obligation' is incurred."  Plt.'s Resp. Br., dkt. #43, at 10.  That is unclear.  The claim refers to the visit as a "follow-up" visit and refers to the advertisement as having been "transacted."  Under one reading of claim 15, one transaction must be completed, "payment obligation" included, before the claimed "follow-up" visit occurs.  Nonetheless, uncertainty about the scope of claim 15 is irrelevant.  The parties are not seeking construction of the terms of claim 15; rather, they use that language as evidence of the proper meaning of other terms.  Assuming that this evidence favored defendant, it still falls short.

Even assuming that any claimed "follow-up" visit under claim 15 must occur after the first payment obligation is incurred, claim 15 would still be consistent with pay-to-click pricing in claim 1.  Claim 15 does not require the claimed "follow-up" visit be the first visit to a website; the first one could have already happened by clicking on a paid advertisement and any subsequent visits would still be considered "follow-up" visits under claim 15.

Defendant also seeks to establish pay-to-display pricing by reference to the preambles

that precede certain claims, which describe the claimed methods as being "for transacting an advertisement transfer from an advertisement distributor to a visitor." E.g., '436 pat., cl. 1. According to defendant, because the "transaction" must be for "transfer" of the advertisement, it cannot cover pay-to-click pricing, which "transfers" the advertisement but does not charge for it unless it is clicked on.

However, the term "transacting" appears only in the claims' preambles. The general presumption is that the preamble should not be imported into the limitations of the claims. Catalina Marketing International, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 808-09 (Fed. Cir. 2002) (preamble not limiting when claim body defines structurally complete invention and preamble merely states purpose or intended use for invention, at least so long as preamble not relied on during prosecution). According to plaintiff, the term "transacting" simply summarizes the end result of performing the claimed steps; a transaction comes about as a result of the advertisement system.

Defendant responds that the term "transacting" defines the subject matter, as shown by the title of the patents, the abstract, the summary of the invention, repeated references to "transacting" throughout the specification and its appearance in the preamble of every independent claim, citing Poly-America, L.P. v. GSE Lining Tech., Inc., 383 F.3d 1303, 1310 (Fed. Cir. 2004) (term "blown-film" found in preamble limiting because specification replete with references, including title and summary; phrase used to describe preferred embodiment;

10

and entire preamble restated in each of seven claims).

However, the test is not whether there are repeated citations to a term used in a preamble, but rather whether the preamble "recites essential structure or steps, or . . . is 'necessary to give life, meaning, and vitality' to the claim" as opposed to merely stating a purpose or intended use for the invention.  Id. at 1309 (quoting Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1309 (Fed. Cir. 1999)).  Thus, in Poly-America, 383 F.3d at 1310, the preamble was found to be limiting because "the inventor considered that the 'blown-film' preamble language represented an important characteristic of the claimed invention."  The same cannot be said for the preamble's description of the claimed method in these patents as being for "transacting an advertisement transfer."  The details of how the method operates are described thoroughly in the claim itself and the details about the exact basis for pricing, be it display or user clicks, are unimportant to the method for transferring the advertisement on the basis of attribute-by-attribute bidding.  As defendant acknowledges, the specification makes only an "isolated" reference to the possible bases for payment, and one of the bases mentioned is pay-to-click.  '436 pat., col. 4, lns. 22-31.

Defendant's final argument for limiting the claims to pay-to-display payment structures is that the patentee disavowed pay-to-click during prosecution of the patent.  In the course of prosecuting the '436 patent, the applicant distinguished certain prior art, explaining that "Hanson and Goldhaber rely on one or more aspects of viewer choice in their methods, and

11

it is clear from the amended claims that viewer choice is simply not an aspect of the invention's standard." Dkt. #35-8 at 12.  Because clicking on an advertisement is a form of "viewer choice," defendant reasons, pay-to-click pricing has been disclaimed.  However, plaintiff explained at the claims construction hearing (and defendant did not deny) that the "viewer choice" the applicant described during patent prosecution was of a different sort. In particular, the applicant distinguished Hanson and Goldhaber because they involved viewers opting in to receive ads in the first place.  Defendant contends that a viewer's decision to click on the ads is of the same nature, but the difference is an important one:  by the time the viewer clicks on the ad, he or she has already been exposed to the ad.  As the Court of Appeals for the Federal Circuit has explained, arguments made to distinguish prior art references will not amount to disclaimer unless the arguments are "clear and unmistakable surrenders of subject matter." Cordis Corp. v. Medtronic Ave, Inc., 511 F.3d 1157, 1177 (Fed. Cir. 2008) (citation omitted).  At worst, the applicant's differentiation of Hanson and Goldhaber could be considered an "unmistakable surrender" of methods related to viewers opting in to receive advertising.  It cannot be stretched so far as to disclaim any method involving any aspect of "viewer choice."

Defendant cites another statement made during prosecution of the patent in which the applicant showed that it "understood" the prices were for showing the ad to visitors because it stated that the visitor would be "seeing" the ads and the advertiser would be "showing" its

ads.  However, defendant neither suggests that the applicant made the statement in an attempt to distinguish prior art nor otherwise explains how these open-ended assertions could amount to a "clear and unmistakable surrender of subject matter" as required to establish disclaimer.  <u>Cordis</u>, 511 F.3d at 1177.

In sum, none of defendant's arguments for limiting the claims at issue to "pay-to-display" pricing are persuasive.  I conclude that no such limitation applies to those claims.


B. <u>Terms Related to Nature of Bid Selection</u>

The parties dispute whether certain claim terms require selecting or identifying a bid that is the "highest price an advertiser has agreed to be charged."  According to defendant, this limitation is required for the terms "selecting the combination . . . that yields the highest price" from claim 1 of the '436 patent and claim 2 of the '853 patent; "identifying . . . which of the bids yields the greatest overall price" from claims 1, 11 and 15 of the '364 patent; and "identifying . . . a bid based on the total" from claim 1 of the '637 patent.

Although defendant groups these terms together, the language of each term is different. The first term relates to selecting the combination that "yields the highest price" and the second term relates to identifying "which of the bids yields the greatest overall price."  The third term includes much broader language, covering "a bid based on the total."  At first blush, the language of the first and second term suggests that defendant's proposed "highest

13

price" limitation is appropriate, at least for those two terms.  However, the parties' principal dispute is whether the claimed price must be one that "an advertiser has agreed to be charged."  In other words, must the "highest price" be one that an advertiser selected and agreed to?  Indeed, defendant takes this a step further than its proposed construction, arguing that the price charged an advertiser must be its own bid.  (Thus, defendant is really seeking a construction that the price selected or identified must be the highest price *that* advertiser has agreed to pay.)  This issue arises because defendant's pricing system uses the *second* highest bid to determine the highest bidder's price.

As plaintiff explains, none of the claim language is tied to what price "an advertiser has agreed to be charged."  Defendant points to the fact that the patent specifications do not disclose any method other than selecting the "highest price" or bid.  This alone does not support a requirement that the highest price be one a given advertiser has agreed to pay.  To the extent defendant is arguing that there is not sufficient disclosure of other types of pricing within the specification, this is an issue to address in the context of assessing the patent's validity, not a reason to narrow the scope of the claim language.

Moreover, defendant's citations to specific examples in the specification referring to highest price do not show that the bid must be based on the highest price an advertiser selected.  This includes defendant's explanation that a particular matching tree procedure was designed to allow the highest bid to be identified when a visitor arrives.  '436 pat., col.

14

10, lns. 38-47. Even the specifications' repeated references to terms such as highest price, highest bid, highest offer, highest bidder and highest-priced combination fall short; none refer to the "highest price that an advertiser has agreed to be charged" and there is no reason to think these terms were intended to provide such a limitation.

Defendant points out that during prosecution of the '436 patent, the applicant responded to a first rejection from the patent office by stating that "the publisher benefits by always having the advertiser . . . willing to pay the highest price show his ad." However, in context, the statement is harmless. In an attempt to distinguish Roth, the applicant explained that

> [t]he present invention aims to create an efficient profile based market place via a system that enables the advertiser to place a price tag on each profile attribute that make[s] up the profile of its target audience . . .
>
> ***
>
> With one simple price offer, the advertiser has created a pool of potential profiles he is bidding for. The advertiser benefits from paying exactly in accordance of the value he sees in the profile of the visitor that will see his ad . . ., the publisher benefits by always having the advertiser that is willing to pay the highest price show his ad to the visitor.

Plt.'s Amt. D to PTO, dkt. #35-8, at 4. The applicant's focus is on pricing each profile attribute, not on whether the price bid is determined by the highest price an advertiser agreed to pay. More important, nothing in the statement suggests that the advertiser "willing to pay the highest price" must ultimately pay the price he agreed to pay during bidding. Thus, even if the prosecution history statement could be treated as a disclaimer,

15

it would not require pricing to remain tied to the highest bidder's offer.  Defendant has failed to show that the "price" the highest bidder is to pay must be the highest bid.

### C.  "Spreading"

Claim 1 of the '436 patent and claim 1 of the '853 patent include the step of "spreading the attributes of a preponderance of the responses to form a number of combinations of various attributes."  The parties dispute how many "combinations" are required to satisfy the requirement that a "number" of combinations be spread.  According to defendant, the claimed spreading must form "every possible combination of attributes"; plaintiff contends that "one or more combinations" is sufficient.

Plaintiff's proposal is problematic for a number of reasons.  First, the claim language suggests "more than one," not "at least one."  Although technically "one" is "a number," describing one or more combinations as "a number" of combinations is an odd choice of words, especially when the patentee used the term "at least one" elsewhere in the same claims to express that concept instead.  E.g., '436 pat., cl. 1 ("at least one advertisement distributor").

Even if the claim language would support reading "a number" as broadly as plaintiff proposes, the prosecution history requires otherwise.  As defendant points out, during the prosecution history, the applicant distinguished Roth, stating that it did not disclose "[a] key

16

aspect of the invention defined in the claims," which was the spreading of attributes "to form a large number of bid-response combinations."  The applicant further stated that "This 'spreading' step involves an information pre-positioning of *the large number of combinations*, and is an essential step that allows the invention to operate viably in real-time."  Dkt. #35-8 at 12 (emphasis added).  In allowing the patent, the examiner explained that the prior art did not disclose "spreading the attributes within the response to form a number of combinations of various attributes (to form groups of profiles comprising a plurality of attributes)."  Id. at 20.

Plaintiff's statements constitute disclaimer.  Plaintiff argued away from prior art by relying on the "spreading step," and in particular on the step forming a "large number" of bid combinations.  It cannot backtrack now and argue that spreading need only form a single bid combination.

At the same time, this evidence does not support defendant's proposed definition requiring "every possible combination" of attributes.  Defendant points out that the specification describes performing the spreading step before a visitor arrives to quickly identify which advertisement to return and provides an example of spreading that involves forming all possible combinations with all required attributes and a set of non-required attributes.  '436 pat., col. 15, ln. 60-col. 16, ln. 17; see also id., col. 14, lns. 12-13 ("This structure is used in order to create all combinations of attribute values that actually define

17

the profiles."). However, as plaintiff points out, these descriptions are merely descriptions of the preferred embodiment; nothing about them suggests an intent to limit the claims. Moreover, the claim language itself does not require every possible combination, instead stating only "a number of combinations."

Defendant also argues that without requiring "every possible combination," the highest bidder could not be determined because "you don't know if you've captured the sum of the person's bid" without considering every possible combination of attributes. Tr., dkt. #47, at 62. Defendant does not attempt to explain its argument any further, leaving it unclear whether there might be other ways to assess the highest bidder. Regardless, this argument is more an undeveloped argument about the meaning of "highest bidder" or a premature argument for invalidity than it is an argument about the proper scope of the claimed "spreading." Id., at 63 (defendant concedes that "[t]hat may be something we need to come back to in terms of validity"). The claimed "spreading" must be of more than one combination of attributes, but defendant has failed to show that it must be every possible attribute.

Defendant also contends that each claimed combination must include both "required" attributes and "non-required" attributes. Defendant's argument for limiting the combination to one that includes both required and non-required attributes relies on nothing more than the fact that both such sorts of attributes are shown in the embodiment found in the

18

specification.  Defendant's mere reference to a preferred embodiment is not a sufficient reason for this court to read a limitation into the claim language.

### D.  "Economic value contribution"

The parties dispute whether the term "economic value contribution" from claim 1 of the '436 patent and claim 1 of the '853 patent must be limited to a "price" with a "monetary value" or may include any "variable affecting a bid price."  The claims at issue require "determining the price of each combination of attributes by logically and arithmetically aggregating the economic value contributions."  Defendant's argument for imposing its two limitations reduces to its view that the specification does not describe the economic value contribution but repeatedly discusses prices, and in the prosecution history, the applicant framed the patent in terms of "prices."  However, as plaintiff points out, the claims use the terms "price" and "economic value contribution" to mean different things; indeed, the claims require determining the "price" by means of the "economic value contributions."  Moreover, the claims describe a determination of price more complex than simply "summing" up contributions as though they were all set monetary values, requiring that the contributions be "logically and arithmetically aggregat[ed]."

The specification and prosecution history support a broader construction of economic value contribution than merely "price."  The specification describes the logic tag Must Not

19

as affecting the price:  if a "Must Not" value is discovered in a combination, the price for that combination will be set to 0.  '436 pat., col. 15, lns. 41-43.  In addition, the patentee added "logically and arithmetically aggregating" during the prosecution history of the '436 patent and remarked that this limitation "goes well beyond" the limitation in "the previous Claim 1, which stated only that the price of the visitor profile was determined as the sum of the attribute prices."  Dkt. #37-6, at 17.

Moreover, defendant's proposed limitation is an attempt to exclude percentage bids (which are not simply summations of attribute prices), but some of the dependent claims in the patents include "percentage bids."  Thus, the independent claim presumably covers that sort of figure as well.  Bradford Co. v. Conteyor North America, Inc., 603 F.3d 1262, 1271 (Fed. Cir. 2010).  Because none of defendant's arguments support interpreting "economic value contribution" to mean simply "price," defendant's request to limit the scope of this claim term must be rejected.

### E.  "At least some of the plurality of attributes"

The parties' final dispute related to plaintiff's patents is whether the term  "at least some of the plurality of attributes" found in claim 1 of the '436 patent and claim 1 of the '853 patent must include more than one "plurality of attributes."  Perhaps in some contexts the term "some" might mean "one or more," as plaintiff points out; in this context, it does not.

20

The key paragraph claims:

collecting responses from the at least one distributor, wherein a preponderance of the responses have a plurality of attributes and the at least one distributor has assigned to each of at least some of the plurality of attributes an economic value contribution,

E.g., '436 pat., cl. 1.  As defendant points out, the same paragraph within the claim refers twice to "at least one distributor" but then immediately after uses the phrase "at least some" to describe the number of "the plurality of attributes" to which the distributor must assign an economic value contribution.  Plaintiff does not explain why a different term was used within the same paragraph when the inventor intended to claim "at least one."

Defendant explains in detail the prosecution history related to this term, explaining that the applicant sought to distinguish prior art, Roth, by pointing out that it did not have a workable multiple bidding scenario.  By that, the applicant meant that Roth did not break down the price of a bid into micro-values like age or geographic location but instead required separate entire bids for each different variation of qualities such as age and geographic location.  Thus, the applicant was arguing that Roth was effectively incapable of multiple bidding, unlike the present invention.  Although plaintiff points out that the criticism of Roth is rooted in whether it assigned micro-values, its "disadvantage" is described in terms of lacking the real capacity for multiple bidding at all.  This assertion would be irrelevant if the present invention did not require multiple bidding, meaning there must be more than one "plurality of attributes."

## II.  DEFENDANT'S PATENT

Defendant's patent relates to storing user information on a server to customize "network documents" including web pages.  The parties disagree about the meaning of the term "obtaining" found in claims 1-4, 8-13 and 16-20.  Plaintiff contends that "obtaining" means "receiving" an "affirmative submission" from the user.  (Although plaintiff's proposed construction does not mention "affirmative submission," its discussion of this construction shows that it believes that this limitation should be included.  <u>E.g.</u>, Plt.'s Br., dkt. #36, at 34)

Plaintiff fails to provide a convincing case for the limitation.  Plaintiff points out that the specification describes the user as returning customization information to a server, shows the user making an affirmative selection returned to the server and describes customization options related to individual preferences.  However, these descriptions are found only in the context of describing a preferred embodiment.  Nothing about the specification's description of a "user affirmatively submitting user information" suggests that the patentee intended to limit the scope of its methods for "obtaining" user information.

Next, plaintiff points out that during prosecution of the patent, the patentees distinguished defendant's own beta version of a customizable home page, which "did not use a unique identifier to lookup customization information" and "had all of the user's custom

22

settings stored in the cookie itself, not stored on the server." Dkt. #37-8, at 6-7. The patentees obtained allowance of their claims after arguing on appeal that the prior art cited by the examiner used on-computer cookies but the claimed invention "avoids the drawbacks of the above-described technique by storing the customization information on a <u>server</u> computer, rather than the <u>client</u> computer." Dkt. #37-7, at 6-7.

The problem for plaintiff is none of this shows "affirmative submission" by the user. It focuses on the presence of a "unique identifier" and storage of settings on the computer rather than the server. None of this speaks to whether a user needs to "affirmatively submit" information. The only "affirmative submissions" are found in the preferred embodiment of the specification mentioned above, and the discussion about the prosecution history supports only the requirement that the customization information be stored on a server rather than in-computer, a requirement already spelled out explicitly in the claims themselves. In short, plaintiff's evidence fails to support the limitation it seeks.

ORDER

IT IS ORDERED that the following claim terms are construed as follows:

1. The "spreading" claimed in claim 1 of the '436 patent and claim 1 of the '853 patent must form more than one combination of attributes.

2.  The term "at least some of the plurality of attributes" found in claim 1 of the '436 patent and claim 1 of the '853 patent requires more than one plurality of attributes.

3.  None of the specific definitions the parties have proposed for the claim terms at issue will be adopted and none of the remaining limitations requested by the parties are contained within the claim terms at issue.

Entered this 7th day of June, 2011.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

24